**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

| | |
|---|---|
| HEALTHCARE ADVANCED RISK TECHNOLOGIES, INC., and INSPIRIEN HOLDING CORP., | : **Case No.: 2:22-cv-04192** |
| | : |
| Plaintiffs, | : **VERIFIED COMPLAINT** |
| | : |
| v. | : **JURY TRIAL DEMANDED** |
| | : |
| TERENCE MILLS, AI.IO CORP., JANE NEMCOVA, and VEUU, INC., | : |
| | : |
| Defendants. | : |

----------------------------------------------------------X

## INTRODUCTION

1.     Plaintiffs contracted with Defendants Terence Mills, and his company AI.io, to develop software to streamline and automate the medical billing process, which costs the healthcare industry fortunes and is one of the biggest issues facing healthcare providers.

2.     Neither Mills nor his company AI.io had any experience in the healthcare industry before working with Plaintiffs, but had experience with software development.

3.     After entering into carefully tailored non-disclosure and noncompete agreements to protect its intellectual property and confidential information, Plaintiffs shared confidential information with Mills and AI.io and paid them to develop the technology.

4.     But after the information was shared and development began, Mills suddenly withdrew his company from developing the technology further and abruptly ceased contact.

5.     Unbeknownst to Plaintiffs, Mills formed a new entity just before he terminated contact, Defendant Veuu, Inc.

6.     Mills formed Veuu, upon information and belief, to keep developing the same technology that AI was developing for Plaintiffs.

7.    Veuu promotes nearly a nearly identical and competing products automating medical billing, to Plaintiffs' technology and that Mills and AI were working to develop for Plaintiffs.

8.    And upon information and belief, Veuu's products are being offered to or through companies that Plaintiffs presented to and informed Mills about under the parties' agreements.

9.    Defendants used Plaintiffs' confidential and trade secret information to develop the automating medical billing technology in violation of the noncompete and confidentiality provisions to keep developing these products.

10.    Because Defendants misappropriated Plaintiffs' confidential information and trade secrets to unlawfully and unfairly start a competing business and breached the confidentiality and non-competition provisions of the parties' agreements and other laws, Plaintiffs seek preliminary and permanent injunctions, money damages, and other relief as described further herein.

## JURISDICTION AND VENUE

11.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, as the matter in controversy includes a claim arising under the laws of the United States, including 18 U.S.C. § 1836(b) for trade secret misappropriation under the Defend Trade Secrets Act.

12.    Upon information and belief, and to the extent the matter exists between citizens of differing or foreign states, this Court also has original subject matter jurisdiction under 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.    This Court also has supplemental jurisdiction over all state law claims, under 28 U.S.C. § 1367, including, but not limited to, all claims arising under New York State and Florida common law of contracts and trade secret misappropriation.

14.     This Court has personal jurisdiction over Defendant AI because, upon information and belief, AI engages in continuous business in the State of New York and maintains its principal office in this judicial district.

15.     This Court has personal jurisdiction over Defendant Veuu because, upon information and belief, Veuu does business in the State of New York and maintains an office in this judicial district.

16.     This Court has personal jurisdiction over Defendant Mills because, upon information and belief, Mills is or was a citizen and resident of New York and resided in this judicial district during relevant portions of time related to the claims in this suit.

17.     AI and Mills also agreed to the venue clause in the parties' Mutual Nondisclosure Agreement requiring that any suit be brought in a court in Suffolk County, New York.

18.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because, upon information and belief, substantial parts of the acts giving rise to the claims occurred in the State of New York, Defendants AI and Veuu maintain their principal offices in this judicial district, Defendant Mills resides in this judicial district, and Defendants each are subject to personal jurisdiction in this judicial district.  In addition, the contract that supports claims asserted here against Defendant AI requires that "[t]he validity, construction, and performance of this Agreement [be] governed by the laws of the State of New York."  (Services Agreement § 12.2.) AI and Mills also agreed to the venue clause in the parties' Mutual Nondisclosure Agreement requiring that any suit be brought in a court in the Eastern District of New York.

**THE PARTIES**

19.     Plaintiff Inspirien Holding Corporation ("Inspirien") is a corporation organized and existing under the laws of Alabama, with its principal office located at 509 Oliver Road,

Montgomery, Alabama 36117.

20.    Plaintiff Healthcare Advanced Risk Technologies, Inc. ("HART") is a corporation organized and existing under the laws of Delaware, with its principal office located at 509 Oliver Road, Montgomery, Alabama 36117.

21.    Inspirien is an affiliate of Plaintiff HART, and is in the business of insurance and innovation in the healthcare space.

22.    HART was formed to advance developing the technology that leads to the claims here.

23.    Upon information and belief, Defendant AI.io Corp. ("AI") is a corporation organized and existing under the laws of Delaware, with its principal office located at 41 E. 11th Street, 11th Floor, New York, New York 10003, and its registered agent's office located at 251 Little Falls Drive, Wilmington, Delaware 19808.

24.    Upon information and belief, AI is an artificial intelligence, data science, and engineering company led by Defendant Mills as its chief executive officer.

25.    Upon information and belief, Defendant Veuu, Inc. ("Veuu") is a corporation organized and existing under the laws of Delaware, with its principal office located at 401 E. Jackson Street, Unit 3300, Tampa, FL 33602, and its registered agent's office located at 7901 4th St. N. Ste. 300, St. Petersburg, FL 33702, and is led by Defendant Mills as its chief executive officer.

26.    Upon information and belief, Veuu advertises software-based healthcare claims coding and revenue cycle management solutions in the healthcare space.

27.    Upon information and belief, Defendant Terence Mills is the chief executive officer of both AI and Veuu, and is a citizen and resident St. Petersburg, Florida.

28.    Upon information and belief, Defendant Jane Nemcova is the chief operating officer of Veuu, and was and may still be the chief operating officer of AI, and is a citizen and resident of Tarpon Springs, Florida.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.    Inspirien hires AI to develop the Technology.**

29.    In October 2018, Inspirien met with Mills at AI's office in New York to learn whether to use AI and its software development capabilities to assist Inspirien in the healthcare space.

30.    Mills presented AI's capabilities to Inspirien's board Shortly thereafter.  Mills proposed "Shark Tank" presentation to allow the board to vet whether AI's capabilities could be used to address certain healthcare issues pertinent to Inspirien's business.

31.    Inspirien then engaged AI.

32.    On November 15, 2018, Inspirien and AI entered into an Artificial Intelligence Development and Services Agreement ("Services Agreement").  A true and correct copy of the Services Agreement is attached as **Exhibit A**.

33.    Inspirien paid AI to create and develop a "white box artificial intelligence infrastructure solution" ("Technology").  Exhibit A, Services Agreement § 1.1.  The Technology was to help streamline and automate the medical billing, coding, and claim risk analysis process conducted in everyday healthcare insurance business.

**B.    The Services Agreement States the Technology belongs to Inspirien and protects Inspirien's confidential information through non-compete and confidentiality provisions.**

34.    The Services Agreement explicitly provides that AI would develop the Technology as a "Work for Hire as contemplated and defined in Section 101 of the United States Copyright

Act." AI also granted to Inspirien "absolute and forever, all rights of every kind and nature, in and to the [Technology] . . . ." Ex. A § 9.1. That is, all aspects of the Technology created and developed by AI under the Services Agreement belonged to Inspirien.

35. To reinforce and protect Inspirien's rights and ownership in the Technology, the parties included into a Services Agreement a noncompete provision, which narrowly but explicitly prohibits AI or its personnel from developing similar technology in healthcare billing services for two years following any termination of the Agreement:

> **9.4  AI Restricted Activities**. During the term of this Agreement and for a period of two (2) years thereafter, AI shall not itself, nor assist any third party, or participate with any third party to assist another to, develop any Technology similar to the functionality contemplated to be performed by the [Technology] for use in healthcare billing services or for any of the activities described in Section 9.1(ii) above. The provisions of this Section 9.3 [sic] do not restrict or limit AI's use or development of similar Technology for any other purpose; provided, however, that such Technology does not incorporate or reveal Client IP or Client Data and is not derived from any Client IP or Client Data.

*Id.* § 9.4.

36. The noncompete provision survives any termination of the Agreement. *See id.* § 12.6 (providing that termination of the Agreement "shall not relieve either Party of its obligations" under the noncompete provision, among others).

37. While working under the Agreement, AI and Mills had access to confidential and trade secret information of Inspirien, and later HART. This information included, among other things, Plaintiffs' formulas, variables, metrics, algorithms, and calculations used and applied in their insurance claims analysis. It also included applying that information into software and services for the healthcare and healthcare revenue cycle management space.

38. He also received the identities of the main competitors and potential customers for the software and services in that space.

39.    In addition, the Technology, as developed by AI and Mills under the Services Agreement, similarly constitutes and includes Plaintiffs' confidential and trade secret information, and includes the methodology of applying that Confidential Information into the software and service for the healthcare industry.

40.    Plaintiffs' confidential and trade secret information is critical to their business and is not widely known to the public.  Plaintiffs have developed this information over time through the investment of substantial amounts of time and resources.

41.    Plaintiffs protect their confidential and trade secret information through their internal policies and procedures, which require their employees not to disclose any confidential or trade secret information both during and after their employment, including other technological and procedural safeguards.

42.    To ensure that the confidentiality of the confidential and trade secret information of Inspirien (and later HART) was preserved, Inspirien also entered into a Mutual Nondisclosure Agreement ("NDA") with AI, Mills, and affiliates.  A true and correct copy of the NDA is attached as **Exhibit B**.

43.    Under the NDA, AI, Mills, and Nemcova were obligated:

(a) to keep secret and maintain the Confidential Information as confidential; (b) to exercise all reasonable precautions to prevent unauthorized access to the Confidential Information; (c) to return promptly to the Discloser at any time upon the Discloser's request, any and all materials pertaining to or containing any Confidential Information.  Recipient shall not disclose the Confidential Information to any person or entity not a party to this Agreement other than such Recipient's agents or employees who (i) have a need to know the Confidential Information for the Permitted Purpose; and (ii) are apprised of the confidential nature of the Confidential Information and of the restrictions set forth herein.

Ex. B, NDA § 3.1.

44.    The NDA defines "Confidential Information" broadly to include any "Information

7

disclosed to [AI] by [Inspirien] or by any Related Party."

45.    "Information" is defined broadly as:

all forms and types of financial, business, marketing, operations, scientific, technical, economic and engineering information, whether tangible or intangible, including without limitation, patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, codes, know-how, computer software, databases, product names or marks, marketing materials or programs, plans, specifications, shop-practices, customer lists, supplier lists, engineering and manufacturing information, price lists, costing information, employee and consulting relationship information, accounting and financial data, profit margin, marketing and sales data, strategic plans, trade secrets and all other proprietary information . . . .

Ex. B § 1 ("Information" and "Confidential Information" definitions).

46.    AI, Mills, and Nemcova were also obligated "to use the Confidential Information solely for the Permitted Purpose," including limiting use of Plaintiffs' intellectual property in any software or technology stemming from it. *Id.* § 3.2.

47.    The NDA defines "Permitted Purpose" to mean "consideration of a business relationship or transaction *between the parties*, and any resulting relationship or transaction, *but not a Recipient's use outside of such relationship*." Ex. B § 1 ("Permitted Purpose" definition) (emphasis added).

48.    To further ensure that Inspirien's (and later HART's) confidential and trade secret information was preserved, the parties also included detailed confidentiality provisions in the Services Agreement. *See* Ex. A §§ 10.1-10.6.

49.    These provisions define and prohibit disclosing Inspirien's "Confidential Information" or using it for any purpose not "expressly stated in this Agreement." Ex. A §§ 10.2, 10.4.

50.    The Services Agreement defines Confidential Information to include:

(i) information concerning its research and development activities, including

development of new [Inspirien] products; (ii) its processing techniques and know-how; (iii) its software, firmware and computer programs and the elements of the design relating thereto; (iv) its designs, drawings and formulae; (v) financial and other business information with respect to [Inspirien] that [Inspirien] has not made publicly available; (vi) information about [Inspirien's] vendors, including products ordered by [Inspirien] from such vendors as well as prices and delivery scheduled for such products; (vii) any information disclosed to [Inspirien] by any third party about which [Inspirien] has agreed, or is otherwise obligated, to treat as confidential or proprietary; (viii) information about [Inspirien's] actual or potential customers as well as their respective employees or plan participants; or (ix) internal or external data relating to proposed AI member members; or [x] its data relating to healthcare verticals that is not publicly available, regardless of the source.

Ex. A § 10.1.

51.     Inspirien and AI expressly agreed under the Services Agreement "to hold the Confidential Information of the other Party in confidence and not to show or disclose it to any third-parties" and that such Confidential Information "shall be used only for the purposes expressly stated in this Agreement." *Id.* §§ 10.2, 10.4.

52.     Inspirien and AI further "acknowledge[d] that the other could be irreparably harmed if its obligations under [the confidentiality provisions] are not specifically enforced." *Id.* § 10.6.

53.     Like the parties' obligations under the noncompete provision, their obligations under the confidentiality provisions were "to survive termination of" the Agreement. *Id.* § 12.6.

54.     Finally, the Services Agreement also includes a choice-of-law provision requiring that "[t]he validity, construction, and performance of this Agreement [be] governed by the laws of the State of New York." *Id.* § 12.2.

## C.    Inspirien, AI, and Mills work to develop the Technology

55.     After the NDA and agreements were executed, HART also provided Mills and later, upon information and belief, Nemcova, substantial confidential and trade secret information about healthcare cycle management process information, intelligence, and information covering the

entire process flow from patient interaction to payment, electronic file names which transfer the data electronically between healthcare entities, clearinghouses, and insurance carriers, copies, and explanations of various healthcare information that is not widely available, various coding and payment methodologies, metrics for consistency and uniformity of information included, among other confidential information.

56.    Inspirien also shared key companies in the healthcare revenue cycle management space with Mills including, but not limited to, Cerner, Epic, Allscripts, and 3M.  These were reiterated to Mills on multiple occasions throughout the process.

57.    A confidential report was also shared with Mills where the Inspirien Board had developed a list of pain points.  This was created in 2017.  The ability to get paid was identified in that list.  Inspirien provided more details surrounding the pain points and strategy with Mills.

58.    AI made a presentation to the Inspirien board on December 6, 2018, and during the presentation, AI described the key features of the "neural network" to develop as the Technology, which features would include an "auto coder," a "denial brain," and "risk analysis," among others.

59.    Based on the presentation, Inspirien proceeded with the next phase of the project— termed "MVP-1"—which would entail, among other things, a working demonstration of the Technology, including the auto coder, denial brain, and risk analysis features, among others.

60.    The second Statement of Work, which authorized MVP-1, articulated the project's overarching goal: "to build a neural network (Inspirien AI) that is capable of automating the coding process, reducing mistakes and errors leading to denial of claims, educating, assigning risk to claims and issuing prompt payment, and automatically reconciling payment – all resulting in the reeducation in costs, increase in revenue, and a lowering A/R days."

61.    As the parties worked together to develop the Technology, Inspirien introduced

Mills to its customers and affiliates, large healthcare companies and potential end-users of the Technology. This included personal introductions to various healthcare CEOs, CFOs, other key personnel and the individuals who were performing revenue cycle management tasks who demonstrated the actual process and shared in depth details surrounding the pain points and the vendors such as Cerner, Epic, Allscripts, 3M and others.

62.    The parties executed a third Statement of Work to extend an updated demonstration to March 27, 2019.

63.    As the parties worked together to develop the Technology, Inspirien introduced Mills to its customers and affiliates, including informing or providing access to Cerner Corporation and 3M, large healthcare companies and potential end-users of the Technology.

64.    In January 2019, Inspirien, Mills and Cerner engaged in discussions about Cerner's current work and technology in the healthcare space.

65.    On March 3, 2019, Mills informed Inspirien that he had followed up with Cerner and 3M and "preliminarily confirmed that we can easily integrate Inspirien API into their systems." "This means that users of 3M and Cerner will be able to easily access and use *Inspirien* AI without accessing it separately." **Exhibit C,** a true and correct copy of the March 3, 2019 email correspondence from Mills to Inspirien (emphasis added).

66.    AI presented the working demonstration of MVP-1 to Inspirien on March 27, 2019. In response to certain concerns raised by Inspirien about the payment-methodology feature of MVP-1, Mills proposed to develop "MVP 1.5" to address those concerns, in addition to building the MVP-2 prototype.

**D.    HART is formed, capital is raised, and Mills engages with clients of Inspirien and HART.**

67.    In May 2019, Healthcare Advanced Risk Technologies, Inc. ("HART") was formed

as Inspirien's affiliate and Inspirien transferred its technology and intellectual property relating to the Services Agreement and the Technology to HART.

68.    Soon after, AI agreed to the assignment of the Services Agreement from Inspirien to HART.  A true and correct copy of AI's correspondence consenting to the assignment is attached as **Exhibit D**.

69.    Inspirien and HART raised the capital needed to fund the MVP-1.5 and MVP-2 phases of the project.  Mills also acquired a future equity interest in HART in exchange for his work on MVP-1.5.  With the necessary funds raised, work began on MVP-1.5 and MVP-2 in or around July 2019.

70.    In July 2019, as work on MVP-1.5 and MVP-2 was underway, Mills advised Plaintiffs that he had continued discussions with Cerner and that "[i]ntegration with Cerner API will give us real-time access to data moving forward."  He assured Plaintiffs that the "process for Cerner integration . . . does not expose confidential HART IP or data."

71.    AI delivered MVP-1.5 to HART in September 2019.  MVP-1.5 addressed the earlier concerns about payment methodology.

**E.    Mills proposes a joint venture, as work on the Technology and his discussions with Cerner continue.**

72.    In November 2019, while AI and Mills were working to complete MVP-2, the parties discussed the next phase of the work, "MVP-3."

73.    Mills also updated Plaintiffs about his discussions with Cerner, advising that "regarding the Cerner integration process, we are now on the next step from the Sandbox application to approval for Hart as an official Cerner partner."  He also requested permission to demonstrate MVP-2 to Cerner and assured that he would not be sharing any of HART's IP.

74.    Plaintiffs responded that they first needed to execute an NDA with Cerner.

75.    Around the same time, Mills proposed a joint venture between HART and Lunar Phase Inc., an entity formed by Mills.

76.    The proposed joint venture would entail forming a new entity that would be used to bring the Technology to market.

77.    HART and Cerner entered into an NDA on February 19, 2020, so that Cerner could be brought in on more confidential discussions relating to the Technology.

78.    Two days later, on February 21, 2020, AI presented an overview of MVP-2 to HART, which was approved.

79.    Around that same time, HART uncovered that Mills had scheduled a call with Cerner without informing HART to show the Technology and discuss AI's "capabilities."  Mills had not invited HART, however, and HART had no prior discussions with Cerner since the NDA was signed.

80.    After uncovering the meeting with Cerner, HART demanded participation and observed as Mills represented himself as the source behind the Technology.

81.    Mills presented an illustration to Cerner of how the Technology would function in healthcare yet did not mention HART, even though HART owned the IP depicted in the illustration.

82.    There were no further major discussions about Cerner between or among HART, Inspirien and Mills after that call.

83.    Meanwhile, negotiations for the new joint venture between HART and Mills ensued over the next months.

84.    The parties prepared and negotiated a terms sheet, which described the formation of a new entity "to provide a unified technology and healthcare payments solution."

85.    The terms sheet also described the "purpose" of the new entity as "to deliver a complete AI and payments solution" and identified "three primary problems" that the solution would solve:

1.    Coding inaccuracies that lead to a greater number of claims denials that increase providers expenses.

2.    Claims denials that result from coding problems and issues with accurately sending out a claim to be paid.

3.    Lagging days in accounts receivable.

86.    In short, the proposed joint venture, as outlined in the terms sheet, would carry forward and ultimately bring to market the Technology that AI had been developing for Plaintiffs under the Services Agreement, but would do so through a new entity owned essentially equally between AI and Plaintiffs.  Mills and HART signed the terms sheet.

87.    Nemcova was recommended by Mills to lead the joint venture, but Plaintiffs expressed concerns after having interviewed the candidate.

**F.    Mills abruptly terminates discussions and the Agreement.**

88.    Just days before the joint venture transaction was set to close on August 15, 2020, Mills suddenly informed HART that he would not move forward with the joint venture.

89.    HART met with Mills and proposed revised terms to help move forward with the joint venture, but Mills refused.

90.    After attempts to salvage the deal, Mills abruptly terminated the negotiations and refused to engage in further discussions with Plaintiffs about the joint venture just before its execution.

91.    Mills also suddenly demanded immediate payment of a relatively small outstanding invoice, or he would delete work he had previously performed for Inspirien and HART. That

invoice was paid.

92.     On September 10, 2020, HART and AI executed the final statement of work, which provided for transferring the work that AI had performed under the Services Agreement from AI to HART.  The transfer was to ensure that the Technology would be transferred from AI to HART, the owner of the technology and cemented that AI had no rights in the technology.

93.     Due to Mills' sudden obstinance, HART had to hire a third party to supervise and ensure the proper transfer of the Technology from AI to HART.

94.     On October 2, 2020, Mills, on behalf of AI, advised Inspirien that AI was terminating the Services Agreement without cause effective November 2, 2020.

**G.      Mills Forms Veuu, and keeps developing the Technology, this time with Cerner.**

95.     Meanwhile, and unbeknownst to Plaintiffs, Mills had formed a new entity, Defendant Veuu, with Mills as its chief executive officer and Nemcova as chief operating officer.

96.     Upon information and belief, Mills formed Veuu in August 2020, just before he terminated the parties' discussions of a joint venture, and shortly before he terminated the Services Agreement.

97.     Mills did not inform Plaintiffs of his intent to form this new entity, or that he did form this new entity, despite the parties' discussions of a joint venture and their ongoing work under the Services Agreement.

98.     Upon information and belief, Mills formed Veuu just shy of two years after entering into the Services Agreement—which, as described above, includes a two-year noncompete provision. Ex. A § 9.4.

99.     Yet that provision applies for two years *after* termination of the Services Agreement, however—i.e., at least until November 2022. *Id.*  So when Mills formed Veuu, the

noncompete provision was (and still is) in effect.

100.    Veuu, which describes itself as "an inclusive and sustainable FinTech ecosystem for healthcare," touts its connection with Cerner in offering artificial intelligence-based coding solutions in the healthcare space:

> …Veuu is solving problems in claims coding and long A/R days through advanced AI technology in language and voice that has been developed specifically for the healthcare domain. By accelerating cash flows, Veuu is changing how providers get paid and with the sharing of vital data insights, Veuu is helping providers make decisions that save money, increase revenue, and help to improve the quality of care.[1]

101.    This description echoes AI's articulated goal in developing the Technology of "automating the [claims] coding process . . . resulting in the reduction of costs, increase in revenue, and a lowering [of] A/R days."

102.    It also echoes the purpose and goals of the entity that was to be formed for the joint venture between HART and Lunar, as proposed by Mills.

103.    In fact, Veuu offers a product—called "codeVeuu"—that appears like the Technology that Plaintiffs paid AI and Mills to develop and that they proposed to bring to market under the proposed joint venture.  Through what appears to be a division of Cerner, Veuu promotes "codeVeuu" as follows:

> Through seamless integration to Cerner, users can receive automated coding, risk profiling, acelerated payments of claims, and valuable data insights.  A claim can be coded and paid in 18 seconds.[2]

104.    Veuu also promotes another product—called "riskVeuu"—which incorporates features of the Technology and is advertised as follows:

> riskVeuu is a comprehensive healthcare claim risk engine that is capable of predicting healthcare claim denials, determining likelihood of a healthcare

---

[1] https://app.trinethire.com/companies/35316-veuu/jobs, last visited June 27, 2022.
[2] https://code.cerner.com/apps/code-veuu, last visited June 27, 2022.

payment, the amount of payment and time to payment (A/R days).[3]

105.    In addition, upon information and belief, Nemcova, AI's past and possibly present chief operating officer, is also Veuu's chief operating officer and was proposed by Mills to lead the parties' joint venture.   A true and correct copy of screenshots referencing Ms. Nemcova's positions is attached as **Exhibit E**.

106.    Based on the above, it appears that Mills determined he could better profit from the Technology without having to give Plaintiffs a cut so instead of a joint venture with Plaintiffs, he formed a new company (Veuu), kept developing the Technology, and then sought to market it through or with Cerner and other companies.  Mills cited a small outstanding invoice as a pretext to terminate his relationship with Plaintiffs, and pursued his plan of developing the Technology without Plaintiffs and to deal with Plaintiffs' customers and affiliates instead, including Cerner.

107.    AI, Mills, Nemcova, and Veuu used or are using the technology that Plaintiffs paid AI to develop under the Services Agreeement, to promote or sell products virtually identical to the Technology, or are using the Technology in direct competition with Plaintiffs and in violation of the Services Agreement.

108.    AI, Mills, Nemcova, and Veuu used, or are using, the confidential and trade secret information obtained from HART and Inspirien while working on the Technology to develop, promote or sell products virtually identical to the Technology, or using the Technology, in direct competition with Plaintiffs and in violation of the Services Agreement.

109.    Despite the confidentiality provisions of the Services Agreement, upon information and belief, AI, Mills and Nemcova have disclosed and used Plaintiffs' confidential and trade secret information to Veuu, Cerner, and potentially others, in direct violation of the Service Agreement's

---

[3] https://veuu.com, last visited June 27, 2022.

confidentiality provisions.  *See* Ex. A §§ 10.1 – 10.6.

110.    Despite the noncompete provision of the Services Agreement, AI, Mills, and Nemcova developed and/or assisted third parties Veuu, Cerner, and potentially others, in developing a "Technology similar to the functionality contemplated to be performed by the Solution for use in healthcare billing services," in direct violation of the Service Agreement's noncompete provision.  *See id.* § 9.4.

<u>**FIRST CAUSE OF ACTION**</u>
**Federal Trade Secrets Misappropriation - Defend Trade Secrets Act**
**(Against all Defendants)**

111.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

112.    AI, Mills and Nemcova had access to protected confidential and trade secret information belonging to Plaintiffs.  This information included, among other things, Plaintiffs' formulas, variables, metrics, algorithms, and calculations used and/or applied in their insurance claims analysis, and applying that information into software and services for the healthcare and healthcare revenue cycle management space.

113.    They also received the identities of the main competitors and potential customers for the software and services in that space.

114.    In addition, in performing under the Services Agreement, AI and Mills developed the Technology for Plaintiffs, which similarly constitutes and includes confidential and trade secret information belonging to Plaintiffs.

115.    This confidential and trade secret information provides Plaintiffs with an advantage over its competitors.

116.    This confidential and trade secret information is not widely or publicly known, and

18

Plaintiffs have expended substantial time, effort, money, and resources in developing and maintaining their confidential and trade secret information.

117.    Plaintiffs have at all times taken reasonable measures to maintain the secrecy of their confidential and trade secret information.

118.    Defendants have misappropriated Plaintiffs' confidential and trade secret information and wrongfully disclosed, used and continue to disclose and use the information for their own benefit and to the detriment of Plaintiffs, including by using the confidential and trade secret information to develop and market a competing product, and disclosing and marketing that product to third parties.

119.    The conduct of Defendants, as described above, constitutes a misappropriation of trade secrets.

120.    As a result of this misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

121.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent further use or disclosure of Plaintiffs' confidential and trade secret information.

122.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**Common Law Misappropriation of Trade Secrets**
**(Against all Defendants)**

123.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

124.    AI, Mills and Nemcova had access to confidential and trade secret information belonging to Plaintiffs.  This information included, among other things, Plaintiffs' formulas,

variables, metrics, algorithms, and calculations used and/or applied in their insurance claims analysis, and applying that information into software and services for the healthcare and healthcare revenue cycle management space.

125.    They also received the identities of the main competitors and potential customers for the software and services in that space.

126.    In addition, in performing under the Services Agreement as AI and Mills worked in developing the Technology for Plaintiffs, that work similarly constitutes and includes confidential and trade secret information belonging to Plaintiffs.

127.    This confidential and trade secret information provides Plaintiffs with an advantage over its competitors.

128.    This confidential and trade secret information is not widely or publicly known, and Plaintiffs have expended substantial time, effort, money, and resources in developing and maintaining their confidential and trade secret information.

129.    Plaintiffs have at all times taken reasonable measures to maintain the secrecy of their confidential and trade secret information.

130.    Defendants have wrongfully used and disclosed and will continue to use and disclose Plaintiffs' confidential and trade secret information for their own benefit and to the detriment of Plaintiffs, including by using the confidential and trade secret information to develop and market a competing product, and disclosing and marketing that product to third parties.

131.    Through the foregoing, Defendants have misappropriated Plaintiffs' trade secrets in violation of common law.

132.    As a result of this misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

133.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent further use or disclosure of Plaintiffs' confidential and trade secret information.

Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Mutual Nondisclosure Agreement**
**(Against AI, Mills, and Nemcova)**

134.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

135.    The NDA is a valid and enforceable contract.

136.    At all times since the effective date, Plaintiffs fully performed their obligations under the NDA.

137.    AI was bound under the NDA.

138.    Mills and Nemcova, as officers and agents of AI, likewise were bound under the NDA.

139.    The acts of AI, Mills, and Nemcova, as described above, materially breach the NDA.

140.    AI, Mills, and Nemcova breached the NDA by, among other things, disclosing Plaintiffs' confidential and trade secret information and by using it for purposes not expressly authorized by the Agreement. Ex. B §§ 3.1, 3.2.

141.    Plaintiffs have been damaged by AI's, Mills', and Nemcova's breaches of the NDA.

142.    AI's, Mills', and Nemcova's breaches of the NDA have caused and will continue to cause Plaintiffs to suffer irreparable harm for which there is no adequate remedy at law.

143.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent

further use or disclosure of Plaintiffs' confidential and trade secret information.

144.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Breach of Services Agreement – Confidentiality Provisions**
**(Against AI, Mills, Nemcova)**

145.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

146.    The Services Agreement is a valid and enforceable contract.

147.    At all times since the effective date, Plaintiffs fully performed their obligations under the Services Agreement.

148.    AI was bound under the Services Agreement.

149.    Mills and Nemcova, as officers and agents of AI, likewise were bound under the Services Agreement.

150.    AI's, Mills', and Nemcova's acts, as described above, materially breach the Services Agreement.

151.    AI, Mills, and Nemcova breached the confidentiality provisions of the Services Agreement by, among other things, disclosing Plaintiffs' confidential and trade secret information and by using it for purposes not expressly authorized by the Agreement.

152.    Plaintiffs have been damaged by AI's, Mills', and Nemcova's breaches of the Services Agreement.

153.    AI's, Mills', and Nemcova's breaches of the confidentiality provisions of the Services Agreement have caused and will continue to cause Plaintiffs to suffer irreparable harm for which there is no adequate remedy at law.

154.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent further use or disclosure of Plaintiffs' confidential and trade secret information.

155.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Services Agreement – Noncompete Provision**
**(Against AI, Mills, Nemcova)**

156.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

157.    The Services Agreement is a valid and enforceable contract.

158.    At all times since the effective date, Plaintiffs fully performed their obligations under the Services Agreement.

159.    AI was bound under the Services Agreement.

160.    Mills and Nemcova, as officers and agents of AI, likewise were bound under the Services Agreement.

161.    AI's, Mills', and Nemcova's acts, as described above, materially breach the Services Agreement.

162.    AI, Mills, and Nemcova breached the noncompete provision of the Services Agreement by, among other things, developing and/or assisting third parties in developing a "Technology similar to the functionality contemplated to be performed by the Technology for use in healthcare billing services" during the two-year period following the termination of the Services Agreement. *See* Ex. A § 9.4.

163.    Plaintiffs have been damaged by AI's, Mills', and Nemcova's breaches of the Services Agreement.

164.    AI's, Mills', and Nemcova's breaches of the Service Agreement's noncompete provision have caused and will continue to cause Plaintiffs to suffer irreparable harm for which there is no adequate remedy at law.

165.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendants from engaging in further conduct prohibited under and in violation of the Services Agreement's noncompete provision.

166.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Unfair Competition**
**(Against all Defendants)**

167.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

168.    In performing under the Services Agreement, AI, Mills, and Nemcova had access to confidential and trade secret information belonging to Plaintiffs.  This information included, among other things, Plaintiffs' formulas, variables, metrics, algorithms, and calculations used and/or applied in their insurance claims analysis.

169.    In addition, in performing under the Services Agreement, AI, Mills, and Nemcova developed the Technology, which similarly constitutes and includes confidential and trade secret information belonging to Plaintiffs.

170.    This confidential and trade secret information provides Plaintiffs with an advantage over its competitors.

171.    Upon information and belief, Mills formed Veuu to keep developing, and ultimately selling, the technology, using Plaintiffs' confidential and trade secret information, which Plaintiffs

had disclosed to AI, Mills, and Nemcova while AI was developing the Technology under the Services Agreement.

172.    Defendants used, and/or are using, the same Technology that Plaintiffs paid AI to develop under the Services Agreement, to develop, promote, and/or sell a product or products virtually identical to the Technology, and/or using the Technology, in direct competition with Plaintiffs.

173.    Defendants used, and/or are using, the confidential and trade secret information obtained from HART and/or Inspirien while working on the Technology, to develop, promote, and/or sell a product or products virtually identical to the Technology, and/or using the Technology, in direct competition with Plaintiffs.

174.    Defendants' use of the same Technology that Plaintiffs paid AI to develop under the Services Agreement, to develop, promote, and/or sell a product or products virtually identical to the Technology, amounts to a bad-faith misappropriation of a commercial advantage belonging to Plaintiffs through exploitation of Plaintiffs confidential and trade secret information, in direct competition with Plaintiffs.

175.    Defendants' use of the same Technology that Plaintiffs paid AI to develop under the Services Agreement, to develop, promote, and/or sell a product or products virtually identical to the Technology, amoutns to an unfair and unjustifable attempt to profit from work belonging to Plaintiffs, in direct competition with Plaintiffs.

176.    Through the foregoing, Defendants have and continue to compete unfairly with Plaintiffs, in violation of common law.

177.    As a result of this misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

178.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendants from further unfairly competing with Plaintiffs as described here.

179.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Tortious Interference with Prospective Economic Advantage**
**(Against Mills, Nemcova, and Veuu)**

180.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

181.    Plaintiffs had business relationships with various customers and prospective customers.

182.    Based on these relationships, Plaintiffs had a reasonable expectation of economic advantage with its customers and prospective customers.

183.    Plaintiffs lost this economic advantage as a direct result of actions taken by Mills, Nemcova, and Veuu, including their misappropriation of Plaintiffs' confidential and trade secret information, and by selling technology that belonged to Plaintiffs.

184.    Mills, Nemcova, and Veuu were aware of the business relationships that existed between Plaintiffs and its customers and potential customers.

185.    Plaintiffs informed or introduced Mills to or of its customers and potential customers and affiliates, including, but not limited to, Cerner, while AI, Mills, and Nemcova were working to develop the Technology under the Services Agreement.

186.    Mills, Nemcova, and Veuu intentionally and maliciously interfered with Plaintiffs' business relationships with Plaintiffs' customers and prospective customers, including, but not limited to, Cerner.

187.    This interference with prospective economic advantage involved the misappropriation of Plaintiffs' confidential and trade secret information, unfair competition, and other tortious conduct, and misrepresenting the technologies or ownership by selling technology that belonged to Plaintiffs.

188.    As a result of this misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

189.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Mills, Nemcova, and Veuu from further interfering with Plaintiffs' prospective economic advantage as described here.

190.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Unjust Enrichment**
**(Against Mills, Nemcova, and Veuu)**

191.    Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein.

192.    Plaintiffs disclosed their confidential and trade secret information to AI, Mills, as chief executive officer of AI, and upon information and belief, Nemcova, as chief operating officer of AI.

193.    Mills, Nemcova, and Veuu used and/or is using Plaintiffs' confidential and trade secret information to develop, promote, and/or sell a product or products virtually identical to the Technology with or though Cerner.

194.    Mills, Nemcova, and Veuu have been enriched through their use of Plaintiffs' confidential and trade secret information to develop, promote, and/or sell a product or products

virtually identical to the Technology with or though Cerner.

195.    Mills, Nemcova, and Veuu have been enriched to the detriment of Plaintiffs, in that Mills, Nemcova, and Veuu have misappropriated Plaintiffs' confidential and trade secret information, interfered with Plaintiffs' potential contracts and economic advantage with current and potential customers, and unfairly competed with Plaintiffs, among other tortious conduct.

196.    It would be inequitable to allow Mills, Nemcova, and Veuu to retain these benefits obtained from their misappropriation of Plaintiffs' confidential and trade secret information, interference with Plaintiffs' potential contracts and economic advantage with current and potential customers, and unfair competition with Plaintiffs, among other tortious conduct.

197.    As a result of this misconduct, Plaintiffs have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

198.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Mills and Veuu from further enriching themselves, to the detriment of Plaintiffs, through their misconduct as described here.

199.    Plaintiffs are also entitled to compensatory and punitive damages for the foregoing wrongful, intentional, and malicious acts, in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Healthcare Advanced Risk Technologies and Inspirien Holding Company respectfully request that this Court enter judgment in their favor on each and every claim for relief set forth above and award them relief including, but not limited to, the following:

A.    Enter judgment against Mills, Nemcova, AI.io, Veuu and in favor of Plaintiffs for each claim for relief alleged against them in this Complaint;

B.    Preliminary and permanent injunctive relief enjoining Defendants and their

employees, agents, officers, directors, shareholders, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them from using or distributing confidential information and materials belonging to Plaintiffs, and to cease competing in the coding and revenue cycle management solutions in the healthcare space per the parties' agreements, laws and equity;

       C.     Award all compensatory damages to which Plaintiffs are entitled, plus interest;

       D.     An Order directing the immediate transfer of all confidential and trade secret materials from Defendants to Plaintiffs;

       E.     An Order directing Defendants to file with this Court and serve on Plaintiffs' attorneys thirty days after the entry of any permanent injunction a report in writing and under oath detailing the manner and form in which they have complied with the injunction;

       F.     An Order requiring Defendants to account for and pay to Plaintiffs any and all profits arising from the acts mentioned above of misappropriation;

       G.     An Order requiring Defendants to pay Plaintiffs punitive damages in an amount yet undetermined caused by the acts mentioned above of Defendants, plus interest;

       H.     An Order requiring Defendants to pay Plaintiffs' costs and attorneys' fees in this action; and

       I.     Any such other relief as this Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: July 18th, 2022                    Respectfully submitted,

By: /s/ Dominique J. Carroll
    Adam Wolek (*pro hac vice* admission pending)
    Fox Rothschild, LLP
    777 S. Flagler Dr.
    Suite 1700, West Tower
    West Palm Beach, FL 33401
    Phone: 312-517-9299
    Fax: 561-835-9602
    awolek@foxrothschild.com

    Matthew W. Krueger-Andes (*pro hac vice* admission pending)
    Fox Rothschild, LLP
    101 N. Tryon Street, Suite 1300
    Charlotte, NC 28246
    Phone: 704-384-2600
    Fax: 704-384-2800
    mkrueger-andes@foxrothschild.com

    Dominique J. Carroll
    Fox Rothschild, LLP
    101 Park Avenue, 17th Floor
    New York, NY 10178
    Phone: 212-878-7900
    Fax: 212-692-0940
    djcarroll@foxrothschild.com

    *Attorneys for Plaintiffs Healthcare Advanced Risk Technologies, Inc. and Inspirien Holding Corp.*

## **VERIFICATION**

I, Margaret Nekic, am over eighteen years of age and have not been declared incompetent. I am the President and CEO of Plaintiffs Healthcare Advanced Risk Technologies, Inc. and Inspirien Holding Corp., and I am authorized to make affidavits and verifications on Plaintiffs' behalf. I read the foregoing Verified Complaint and, unless otherwise indicated, know the contents thereof to be true and correct based on my own knowledge or based upon records in the possession and custody of the Plaintiffs and therefore within the Plaintiffs' knowledge. If called upon to testify as to the truthfulness of the statements in the Verified Complaint, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

This the 18 day of July, 2022.

Margaret Nekic
President and CEO, Healthcare Advanced Risk
Technologies, Inc. and Inspirien Holding Corp.,